Counsel, the next case for argument is Loomis v. Cornish. Please proceed. Thank you, Your Honor. May it please the court and counsel, my name is Michael Gross. I'm appearing on behalf of the appellant, Will Loomis, and this is an appeal from the granting of summary judgment in a copyright infringement case, summary judgment granted in favor of the defendant. Mr. Loomis wrote a song entitled Bright Red Chords, and then the defendant released a song that sounds an awful lot like it entitled Domino, and Mr. Loomis filed suit claiming the copyright infringement. The district court granted summary judgment, and we're here challenging that decision. The elements of the copyright infringement claim are proof that the plaintiff owned the copyright, which I think is, in reality, is undisputed in this case, and then proof of infringement by the defendant, that is, that the plaintiff's work was copied. Because there is generally not direct proof available of infringement or of copying, copying tends to be shown by circumstantial evidence. So let me ask this question. The expert did opine that these were similar, but he didn't say anything about whether they were strikingly similar. Now, you know, I listened to it. Why is it that you did not put forward as an issue, which would have gotten you around the access problem, that these were strikingly similar? Was it because the expert would not opine on it? I can't answer the question, and I apologize for that. No need for apologies. I just want to clarify. I don't know the answer to the question, and my assumption would be that if the expert, that counsel in the district court would have been, would have wanted to present evidence of striking similarity if the expert had that opinion. Right. That's what I surmise from it, because I guess one take on this is that, you know, you can argue that the issue of striking similarity would have been something that would have been appropriate here and something that would have been worthy of jury determination and would have gotten you around the access problem, which seems to be a big hang-up here. And I agree that if the expert had expressed an opinion of striking similarity, that should have gotten around the access issue. Mr. Loomis's position is the access issue is covered by the evidence that was presented to the district court. What evidence? Because, frankly, from my perspective, that's the problem here. An astonishing lack of admissible evidence or something that looks like admissible evidence. It mostly seems to be his own say-so. There's a lot of Mr. Loomis's testimony, but there is also testimony. I'll focus on three access points. First, Sonny L. Lee, and then if I have time, I'll speak about Mr. Hooper. And if there's still time, talk about Mr. Bodine. That's great. In your reply brief, you synthesize this. You talk about Hooper, Bodine, Sonny L. Lee, and then you talk about widespread dissemination. That's what I call from your reply brief to support your access issue going to the jury. Yes, Your Honor. Okay. And Ms. Lee was an A&R executive at Universal at the relevant time. There's evidence in the record that Ms. Lee solicited a copy of Mr. Loomis's song, Bright Red Chords, from Mr. Loomis, and that Mr. Loomis's mother emailed a copy, an MP3 formatted recording to Ms. Lee. So Ms. Lee in the A&R department at Universal has a copy of the song, and this is the critical point. She requested it. She solicited it. Do you think it gets you around the broad principle that, you know, the fact that there's a corporate entity here, you know, is not really a trigger point for determining access? You're saying because she solicited it, that makes the difference? And I think that's a critical point in the case, that perhaps is the pivot point in the case. If we're going to be talking about Ms. Lee, and I chose to talk about her first, bare corporate receipt is one thing, and it's like flipping a switch when you have a corporate representative who solicits the material. The reason for the bare corporate receipt doctrine, which says that if all you've got is proof that somebody at the corporation received a copy of the plaintiff's work, the reason that that doesn't satisfy the proof of access requirement is that if it could, then the plaintiff could create the access without the defendant knowing anything about it. But you flip that switch and turn it into something completely different when a representative of the defendant corporation solicited the material. It's not the same thing at all anymore. I don't agree with you. Do you think this would be sufficient to get the access issued to the jury, that alone? No, that alone wouldn't do it. There's also evidence in this case that Mr. McKay, who I believe is the defendant's witness, a vice president of A&R, testified that what the function is of the A&R representative, that's artist and repertoire, and what they do is work with new artists. They seek out music and they work to promote the success of the company, the company's artists and music. So her function is look for new music and work with artists so that the new music has some relevance and some value to the corporation. That's what she does. There isn't evidence in this case that Ms. Lee had direct communication or direct contact with any of the songwriters. There's evidence to the contrary. The songwriters all denied in their statements that they knew her or had contact with her. But this is the point. The point is if there's a person who's got dealings with the infringer and dealings with the access to the material, then that's the path to access. Is there any? What dealings with the infringer? Well, there's no evidence she had any, but she's A&R. Then you don't have what you just told us you needed. Well, I think I do, particularly in the context of summary judgment. What I have is Ms. Lee is in the A&R department. So my person at the corporation is in the A&R department. That's what they're there for. Could I just ask, some cases say if there's evidence of a routine or a practice where person A worked with people of the nature of person B. So that that might be enough. So is there any evidence that Sunny Lee's regular routine or routine of someone in her position would be to work with people like the writers of the domino music? Was there evidence to that effect in the record? The closest thing to direct evidence would be contrary to that, because Mr. McKay testified that he knew the routines of everybody in the A&R department, which would be a good trick, but that's his testimony, and that she wasn't on the team that created this song, which based on the context of the evidence, that means she wasn't one of the songwriters. And he also said there wouldn't have been any reason for her to be in communication with the writers of the song or with Ms. Cornish, but there would be ample reason for her to do what she did for her department. One of the functions of that department is find new music, not for the sake of finding new music, find new music for Universal and its talent. So somebody in the A&R, Ms. Lee, finds new music. She flat out solicits this song with a very complimentary brief e-mail message saying, I heard it, I like it, can you send it to me? And tell me about your group. And then not long afterwards, a Universal artist who, according to evidence that is in the case and according to the nature of A&R work, which is cited in the briefs, not long after that, an A&R, a Universal artist, Jesse Jay, releases Domino. And Domino, if somebody were to, the short, the quick route to figuring out if these songs are similar is go to YouTube and search for the mashup of these two songs. You can't tell the difference. The problem here is that similarity, you know, is certainly a factual matter, and I don't think your adversary challenges whether if the issue was similarity, that it should go to a jury, but we already discussed that it's not strikingly similar, so we have to deal with the access point, which is detached from the issue of similarity. And striking similarity is one thing, and substantial similarity is another thing. Striking similarity, I don't have the expert's opinion for. Right through that, but you have to still get around access. Okay. And my first access point is Ms. Lee and the A&R department at Universal. My next access point, which is where the hearsay starts to get into the picture, would be Mr. Hooper. Well, that's all hearsay. Couldn't you get somebody to really back that up? You would think so, but it's not in the record, and that's a problem to work around in this appeal. However, I think that it can be worked around. There's an awful lot of material in the record, and it's not all hearsay, so I've tried to cull from the record that that is not hearsay and that which might be marginally not hearsay. And what I have for Mr. Hooper is these are facts. Mr. Loomis is perfectly capable of testifying that Mr. Hooper was a member of his band and performed Bright Red Chords, which was the band's most successful song, on many occasions in 2009 and 2010. In 2010, Mr. Hooper told Mr. Loomis, I'm leaving your band, and he left to become the guitarist in Katy Perry's band. In 2010 and 2011, the Katy Perry album, Teenage Dream, and the tour documentary, I think the title was Part of Me, were produced and released. The album first, I believe, released in 2011, or no, 2010, and then the documentary was of her year-long 2011 tour, and it was released in 2012. And from liner notes that Mr. Loomis produced in evidence, which have been considered admissible evidence of access in past cases cited in the briefs, the liner notes established that Mr. Hooper had a songwriting credit on the album, and I think he had a, I'm sorry, he may have only been performing on the album, but the album, there's also evidence from the liner notes that the album was produced. So there is a connection, I believe. Gotwald and Sandberg are listed as co-producers of the movie. I think that's the connection you've made. And I think that Mr. Hooper has a songwriting credit. So is there any evidence, because, I mean, a co-producer could be on the set all the time, have frequent contact with all of the performers, or the co-producers could be off in someplace else raising money. So is there any evidence that there was any contact or any routines or anything that they worked on the same project together in the same place between Hooper and Gotwald and Sandberg? There's Mr. Loomis' testimony that while the album is being produced in 2010 at the studio where he worked, that he often recorded at in Santa Barbara, that Dr. Luke and Max Martin and Mr. Hooper were working on the album at that same studio during that same time. In addition to – Knows that how? Excuse me, I'm sorry. How does he know that? He knows that because he's told that by somebody else. Well, a good part of how he knows that is that Mr. Bodine told him. And that's hearsay. But part of it is the timing. The album is – there's a Bodine connection to the album, and that means there's a Bodine connection to Dr. Luke and Max Martin as well as Hooper. And this is happening in 2011 when Bright Red Chords was at the peak of its renown. Mr. Loomis testified, and I think this would not be hearsay, that the trade publication and the Santa Barbara newspaper both ran stories about his band and his song. So does that go to your widespread dissemination argument? Because it doesn't really show why Gottwald and Sandberg were in the same studio as Hooper. Yeah, that's correct, Your Honor. The only evidence that they're in the studio at the same time is Bodine's statement to Loomis. The timing, though, of these things happening, the album is being made at a particular point in time. Mr. Hooper left Mr. Loomis's band and joined Ms. Perry's band immediately afterwards. He left to join her band. That happens at this same time. The question is just, is there a reasonable possibility that before Domino was released a year later, that Mr. Hooper showed that music to these people who are all gathered for the same purpose, which is pop music, in a studio where the recording happens and where Hooper is, and it's not as neat as you'd like it to be. But there is a lot of evidence there, and I'm hoping to reserve my last six seconds for rebuttal. It's a lot of evidence. It's not hearsay. Thank you. We'll hear from counsel for defendants. May it please the Court. My name is Jeff Movit, and I'm counsel for the appellees. Ms. Cornish, UMG Recordings Incorporated, and Universal for Public Records, a division of UMG Recordings Incorporated. If I may spend the majority of my time talking about the access issue and then speak briefly at the end about substantial similarity, which we do submit there was a lack of evidence to establish substantial similarity, low and striking similarity, which issue was it? So long that you sort of concede that if the issue was substantial similarity, that would be a jury question. The defense do not concede that. I see that. No, Your Honor. Based upon the Court's extrinsic test, the works at issue are to be broken down into their component parts after the similarities are identified. And the similarities were all in the verses, and upon cross-examination, the songs, the allegedly similar sections of the song, the verses, were broken down into their constituent elements per the extrinsic test. And the plaintiff's expert conceded that each of those elements is common, not protectable, can't be monopolized. Let's talk about access. Yes, Your Honor. I'm a little bit concerned about this corporate receipt concept. Yes, Your Honor.  But it seems like this is a little bit different factually because Sunny L. had an e-mail. She liked the song, and she actually asked for it to be sent to her. Doesn't this make this a lot different than the traditional corporate receipt cases? It does, Your Honor, particularly given the size of the company, that the Universal Music Group has approximately 2,600 employees in North America alone. Hundreds of artists. How many A&R representatives? What's that, Your Honor? How many A&R representatives? That is not in the record. Universal makes records and discs and so forth. A great many. I'm not concerned about the people on the assembly line. A great many. Ever gather up all at once? I don't think so. There's a lot of stuff in the records, so we're stuck here. Universal is certainly larger than a lot of companies and most companies in the music business. But at some point, people talk to each other. But it's the plaintiff's burden to show a reasonable possibility of access, as I think the district court. What more would the plaintiff have to do but to say that this person, who's an A&R representative, e-mailed me, liked my song, asked me to send it to her? Why was she doing that? He couldn't trace a path from Ms. Lee to the Domino writers. It's undisputed that her job had nothing to do with Ms. Cordish, nothing to do with the song Domino. It was undisputed that none of the Domino writers, this was admitted by Mr. Loomis' counsel in the district court proceeding, it was admitted that the Domino writers did not know Ms. Cordish, never met her, and never received anything from her. So the plaintiff had nine months of discovery to try to trace a path by which the song could have traveled from Ms. Lee to the Domino writers, given that her job had nothing to do with them, and given that it was undisputed that they didn't know her, never met her. Is there anything in the record that tells us what she did with the material? There's nothing in the record. It would be speculation. And, again, the cases are clear that that is insufficient. The plaintiff doesn't need to prove that Ms. Lee gave it to him, but he needs to prove that there was some reasonable possibility that she did. When you're talking about a corporation of this size with this many artists, he couldn't trace any path from what she did. What the plaintiff is effectively arguing here is that every artist signed to Universal should be charged with access to the entire solicited record collection of every A&R representative. And we respectfully submit that that is too low a burden. That is not a reasonable possibility of access. If there's no path by which it's established that her duties would have at all led to the transmission of the song to the artist at issue. And certainly here there's no allegation or theory that she had anything to do with the other four writers besides the recording artist, Ms. Cornish. What do you have to say about the fact that, admittedly, Hooper's statements are hearsay? We understand that. But your adversary says that there is a timeline here, which is not hearsay, which is clearly established, which is sufficient to raise an inference for a jury. Your Honor, there's no admissible evidence that Mr. Hooper has ever been in the same room with. There's a timeline that was established, right? There's a timeline here of within a certain period of time that all this was happening in terms of the recording, in terms of the song going public, I guess. I mean, maybe you can explain that to me again. Yes, Your Honor. There's admissible evidence that Mr. Hooper was in the plaintiff's band and left the band. And that is where admissible evidence ends. There's no evidence that Mr. Hooper has ever been in the same room with, ever spoke to, ever met, ever had any dealings with any of the five writers of Domino. So in terms of a timeline, Your Honor, there's no admissible evidence other than that he left the band. Is there any evidence showing that, I guess, Bo Dean's hearsay statement was that Gottwald and Sandberg were at the Playback Studios in 2010 at the same time that Hooper was there? So is there any admissible evidence establishing where Gottwald and Sandberg were during that recording session? No, and Your Honor, there's no evidence of that. There's no evidence that they were at any such recording session. There's nothing in the appellate briefs even claiming that CD credits even reflect Mr. Hooper having any dealings with these two writers of the song. And this argument about CD credits and DVD credits was made for the first time in the plaintiff's appellate reply brief. These credits were not filed with the district court. These credits were not even raised in the moving brief. So we respectfully submit that that's true. There's a striking similarity here, do you? I mean, I listened to it. It sounded to me that there's an issue. There's a striking similarity when I listen to these songs. I guess that's what troubles me, to be candid. You know, it's like close but no cigar. There's a lot out there. And I hear this. It troubles me. But you still think this is summary judgment material? Yes, Your Honor, particularly. Well, first of all, the striking similarity was waived. Second of all, there's an earlier song called Rush, which is in the record. That was a hit song that the plaintiff admits he heard before writing his song. And the Rush song contains in the verses, in the same places, bright red chords and domino, these claimed similarities. And this was, again, established at the musicologist's deposition. Before Julian decided, right? Not given that the plaintiff's experts failed to explain. Right. The plaintiff's expert did not find that this was strikingly similar. Nor did he explain how the combination of common elements could give rise to even a reasonable conclusion of substantial similarity. This circuit's precedent is clear under cases such as Sattava v. Lowry, that when there's a combination of commonplace elements, and these elements are all admitted to be commonplace, that it's incumbent upon the expert to explain why this combination rises to the level of the original expression. And popular music is very simple. And these are very commonplace elements. These are basic building blocks. And with respect to, if I may turn back to Ms. Lee and that theory, the Sixth Circuit looked at a very, very similar set of facts in the Jones v. Blige case. And in that case, the Sixth Circuit found that there was no reasonable possibility of access. Here, again, there was an allegation. There was actually sworn testimony that the song had been solicited by an A&R representative. But here, similarly, no path could be traced at the end of discovery between that representative and the artist who made the song. With respect to widespread dissemination, the district court correctly recognized there was simply no evidence of any such widespread dissemination. There are 46 copies sold. That's the only admissible evidence. There's various testimony about alleged licensing agreements to place the song in various retail outlets. However, no contracts for any such licensing agreements were ever produced. You don't question whether or not the video was played apparently in Foot Locker and Champs 2,400 times? I mean, there seems to be a lot of evidence to that effect. There's no admissible evidence of that, Your Honor. Why isn't his testimony admissible evidence? I mean, you don't need a contract to prove that something happened. If the person experienced the thing happening, that's correct, Your Honor. There's no foundation that anyone in the record went to these stores and watched the song being played, certainly not at all the branches throughout the country that they're claiming. So they haven't produced any contracts for these licensing agreements. Instead, they just have assertions, which are obviously based upon the terms of alleged contracts that were never produced, that these songs were played in these various outlets. But no one has the foundation to say, I was there and I watched this, more frankly, given where they're claiming to have been. Why would anyone go to 2,400 stores and say, this is the evidence? Well, they could have produced the contracts memorializing these dealers. They did not do, Your Honor. That's correct. There's no contracts produced for any of these. No, there was a contract. I mean, could it be they just asked for, we want to play your music, give us permission, we'll play it in our hundreds of stores, so on and so forth? I'm not sure why a contract is required. The plaintiff's mother testified that there were contracts, but she did not produce them. That was in the record, Judge. She said there were contracts, but the contracts were not produced. That's correct. So there's no admissible evidence of any licensing deals for this song. Well, again, that's not quite true. If she says there's a licensing deal, that's evidence. Under the best evidence rule, the contracts themselves were required to be testimony regarding the – We're not at the trial level. We don't have to deal with the best evidence rule, I suspect, when we're dealing with a question of summary judgment, do we? I would respectfully submit that the district court properly exercised its discretion in recognizing that there was no, on the evidentiary issue, that there was no admissible evidence of any of these alleged licensing deals, given the fact that there was just testimony about them. They didn't produce a single shred of paper of an actual licensing deal. They also produced these tracking reports about playtime, and I know you made an argument there was inadmissible hearsay, but clearly the mother had contracted with these outfits to track the playtime. What makes that inadmissible? And then she got the printouts that she was relying on. She certainly did pay people to try to place this song. There was no evidence of the record as to how these reports were made, who made them, what methodology was used to make them, and that's really telling given that one of the gentlemen that she hired, Mr. Gessner, filed a declaration and didn't attach these documents, didn't explain how they were made. Would that be the subject of cross-examination at a trial? After nine months of discovery, Your Honor, I respectfully submit that there's a higher threshold to show access, particularly given that even if there were these commercial placements, under the Arditax case, it says that it's not enough to get your work out there. It has to be out there in a way that people would notice, people would pay attention to. There's no evidence in the record that even if, for the sake of argument, the song was placed in some retail outlets, what time of day it was played, how loud it was played, anything that people would actually pay attention to it, because in the Arditax case, similarly, the allegedly infringed works, visual works were placed at fairs attended by millions of people, but the Ninth Circuit held that there was no evidence that people would have paid attention to it. But it's some evidence, and if you combine that with all the other so-called bits and pieces, you might say, right, can't you sort of put it all together and let the jury sort it all out? I respectfully submit that zero plus zero equals zero, Your Honor, that he has a series of theories, none of which are backed up by any admissible evidence. Sort of like your position is this is a close but no cigar case. We would respectfully submit it's not close, Judge. There's a lot of very creative theories, which after nine months of discovery, the plaintiff was unable to proffer any admissible evidence to substantiate. Thank you. And just finally, Your Honor, to the extent that a theory is raised regarding Mr. Bodine, that that was waived, that that theory was not. As we set forth in the paper, some of the theories raised in the papers regarding Mr. Bodine, regarding an individual named Sean Walsh, an individual named Stan Hollander, were not waived, were not raised in opposition to summary judgment at the district court level. In fact, the plaintiff admitted in his response to the statement of uncontroverted facts that there was no admissible evidence to support the theories regarding these gentlemen. And with that, unless the panel has any further questions. Thank you. Thank you. Well, you have a few seconds. You can take as much as a minute, but not more than that. I guess it's up to you. You don't have to answer this, but I'm just curious to hear about this timeline again that you think supports an inference of facts that should go to the jury. The timeline. You mentioned this timeline, you know, about when the music was there, it was out there in the market, so to speak, it was at the studio. I'm a little fuzzy about that. Maybe you can explain that to me again quickly. The timeline as I conceive it is, and as the evidence reflects it, is that Mr. Hooper leaves Mr. Loomis' band at a particular moment in time and goes at that point to become the guitarist in Ms. Perry's band. At that time, Ms. Perry, and between that time and the time that Domino was released, Ms. Perry's first album with Mr. Hooper as guitarist is released, which is the Teenage Dream album. The 2011 documentary is of the tour of Ms. Perry's band, now including Mr. Hooper, a year-long 2011 tour. So what isn't hearsay, I think, is that Hooper leaves one band, joins another band. And that band has a close connection to Max Martin and Dr. Luke, who are actively involved in the DVD, the tour documentary. And I'm sure we're actively involved in songwriting for the Teenage Dream album. So those two people are closely connected to the Perry group, right? And it's at least a reasonable inference that when these people get together and work together to create pop music, that a guy who just left another band, which had at that time its most successful song, Bright Red Chords, that the songwriters get exposed to that song. Be part of the Perry group and then these other folks would know about that. Correct, Your Honor. And it could have been presented more neatly and should have been presented more neatly, probably should have been presented more neatly in this court. But the evidence is there that that's the path for Mr. Hooper. And I appreciate the court's time. Thank you. Thank you. We thank both counsel for your helpful arguments. The case just argued is submitted. We're adjourned. All rise.
judges: Clifton, Ikuta, Block